IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2013 MAY 21   PM 1: 34

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
                    DEPUTY

CARLOS CHACON,

              Plaintiff,

-vs-                                                    Case No.  A-12-CA-226-SS

THE CITY OF AUSTIN, TEXAS; OFFICER
ERIC COPELAND; and OFFICER RUSSELL
ROSE,

              Defendants.

_____

**O R D E R**

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Defendant The City of Austin, Texas's Motion for Summary Judgment [#39], Plaintiff Carlos Chacon's Response [#42], and the City's Reply [#45]; and Defendants Officer Eric Copeland and Officer Russell Rose's Motion for Summary Judgment [#40], Chacon's Response [#43], and the City's Reply [#44]. Having reviewed the documents, the governing law, and the file as a whole, the Court now enters the following opinion and orders.

**Background**[1]

When Plaintiff Carlos Chacon placed two calls to 9-1-1 on the night of April 29, 2011, he probably did not expect to end up on the receiving end of a police Taser. He did, however, and this lawsuit is the result. This is a § 1983 case alleging excessive use of force by Officers Rose and

---

[1] The facts recounted here are drawn from the summary judgment record, which includes, among other things, Chacon's deposition, affidavits from the Officer Defendants, Chacon's 9-1-1 calls, dash cam footage from the officers' squad cars, and affidavits with supporting records from numerous Austin Police Department personnel.

Copeland, and inadequate training and supervision and negligent hiring and retention by the City in hiring and employing the officers.

## I.      Trouble at the Studio 6 Motel—Chacon's Encounter with the Officer Defendants

On the fateful night, Chacon was interested in a late-night massage, and scheduled an appointment with a woman who claimed to offer such services. Chacon was to meet the woman in Room 165 at the Studio 6 motel in north Austin, Texas. After arriving at the room and paying $75, Chacon claims the woman solicited him. Apparently Chacon was only interested in a massage, and told the woman her behavior was both wrong and illegal, and threatened to call 9-1-1 to report her. At this point Chacon claims a man began kicking the hotel room door and yelling at Chacon, telling him the police were present and were going to tow his car unless he moved it immediately.

Chacon states he promptly left the room and located the hotel manager and an on-site security guard, who he informed of the problem. They were reluctant to assist, so Chacon told them he would call the police himself, and initiated a 9-1-1 call. Around this time Chacon also claims the man who kicked the door emerged and threatened to kill him, reaching into his shorts as if to grab a gun, which inspired Chacon to get in his car and begin driving for his own safety.

The parties have produced two recorded 9-1-1 calls from Chacon that night. The first call lasts approximately five minutes, and ends abruptly. The second begins with Chacon stating he was disconnected from his prior call, and lasts another five to six minutes. In each call, Chacon (who identified himself as Carlos Chavez) provides his general location at the motel. He explains he attempted to get a massage but encountered some kind of "operation" being run, involving a "fake" security officer, one or two men, and the alleged masseuse. Chacon claims, in no uncertain terms, a man was walking around with a big gun, waving it at him and trying to shoot him as he drove.

On both calls, Chacon's descriptions of the individuals are generally consistent. He noted the presence of an African American male—the man with the gun—wearing a white shirt, black hat, and black shorts. This man was subsequently identified as John Green. He also claimed there was a Hispanic male in an orange shirt, and a woman in a blue security uniform which he believed to be fake, or at least less than official.[2] Chacon informed the operator he was driving a silver BMW.

Officers Rose and Copeland were dispatched to respond to the call as a "hot shot" call, based on the allegation there was a gun involved. The officers drove to the scene in marked patrol cars with lights and sirens running, which also activated their dashboard cameras and microphones. En route to the hotel, the videos from each patrol car confirm the officers' radio dispatcher stated on at least two occasions the report was of an African American male in a white shirt and black shorts carrying a gun, while the complainant (Chacon) was driving a silver BMW.

Officer Rose was the first to arrive at the scene. Rose encountered a group of four people near the manager's office: a woman in a security uniform, a Hispanic male in an orange shirt, an African American male in black shorts and a white shirt (Green), and a white woman. Rose was flagged down by the woman in the security uniform and Green. Rose asked if someone called about a gun, to which Green responded, "Hell naw, ain't nobody called about no gun." After repeating nobody called 9-1-1, he explained a drunk man came to his room and refused to leave, and was now circling the hotel parking lot in his BMW. One of the women added she saw the driver on the phone, and suggested perhaps he was the one who called about the gun. She then claimed Green called 9-1-1 as well, and Green confirmed he also called the police. The summary judgment record, however, is

---

[2] Near the end of the first call, Chacon increases the number of parties, and claims a group of approximately seven men is trying to surround him.

devoid of any evidence any other 9-1-1 calls on the night in question. There are no recordings of any calls other than Chacon's two calls, and nothing can be heard on the officers' radio indicating their dispatcher had knowledge of any calls other than those from Chacon.[3]

Chacon then pulled around the corner into the view of the group, and Green identified the car as Chacon's. As Chacon slowly approached in his vehicle, Officer Rose immediately drew his gun and pointed it at Chacon. Officer Rose approached Chacon by crossing in front of his patrol car's headlights, which were pointed directly at Chacon, and also raised a flashlight to shine in Chacon's direction. Officer Rose never identified himself as an Austin Police Department officer or any other law enforcement official, and laced nearly every statement with profanity. Officer Rose instructed Chacon, who was driving with the driver's side window down, to stop the car and show his hands. Chacon immediately responded, "I don't have a gun, he's the one," presumably referencing Green. Officer Copeland, who had just arrived, drew his gun and joined Officer Rose as the two officers approached Chacon's car, with Officer Rose continued his profanity-laden instructions to Chacon to put his hands out the window. Chacon initially reached his hands out the window, but then withdrew them, allegedly to put the car in park.

As Chacon opened the car door to exit the vehicle, the officers grabbed Chacon, ordering him to get out of the car. Chacon calmly explained, yet again, he did not have a gun, while Officer Rose continued to yell at him to get on the ground. Once Chacon was out of the car and standing up, Office Rose ordered him to get on the ground again. This command was followed immediately, before Chacon could possibly have complied, by a new order to "not move." Chacon replied, in his

---

[3] For example, the dispatcher's description of the scene remains consistent: an African American male with a gun, and the complainant in a silver BMW. There is no mention of conflicting reports or multiple complainants.

unbelievable but typically calm manner, "I'm not moving." Chacon asked Officer Rose if he was a police officer, and Officer Rose barked, "You're damn right I am."

Officer Rose then attempted to handcuff Chacon, and Chacon tried to pull away. A scuffle broke out between the three men, with both officers (who are much smaller than Chacon) struggling to take Chacon to the ground. Chacon never appeared to swing at either officer, nor did he appear interested in fleeing. Chacon testified he was attempting to lower himself to the ground slowly and safely, and was concerned the officers were going to throw him to the ground and injure him. Once Chacon was down, but apparently still resisting the handcuffs, Officer Copeland punched him twice in the face in an attempt to subdue him. The officers continued to struggle with Chacon's arms, and at one point instructed Chacon not to reach for one of the officers' weapons. Chacon explained, again in his oddly calm manner, he was simply "chewing his gum."

After securing a handcuff around one of Chacon's wrists, the officers attempted to turn Chacon onto his stomach. Chacon continued to resist, and Officer Rose fired his Taser at Chacon. Only one of the probes hit Chacon, and Officer Rose administered two short "drive stuns" from the Taser. Both officers shocked themselves with the Taser wires in the scrum. The Taser effectively subdued Chacon, and the officers were able to handcuff him and keep him on the ground until backup arrived, at which point Chacon was placed under arrest for resisting a search. EMS arrived to treat Chacon for a cut above his eye, caused by Officer Copeland's punches. Chacon was taken to the hospital, received stitches to close the wound, and was discharged.

Sergeant Robert Smith, the officers' supervisor, was among the backup that arrived at the scene, and his dash cam recorded a post-incident discussion with the two officers. In the discussion, the officers express confusion about not knowing what was going on, and not knowing who had

made the 9-1-1 call. Even though the officers had drawn their guns before saying anything to Chacon, they contended it was Chacon's decision to retract his hands into the vehicle which caused the situation to spiral out of control.

## II.    The City's Policies and Procedures

Chacon asserts the City inadequately supervised and trained its officers in the reasonable use of force, and negligently hired and retained Officer Copeland and Officer Rose. Chacon's allegations put in issue a number of the City's policies and procedures governing the management of the Austin Police Department and its personnel.

## A.    Use of Force

APD maintains detailed policies regarding the proper use of force by its police officers. Officers are required to report every use of force to a supervisor. Officers file their reports and, depending upon the level of force used, may have their conduct investigated by a supervisor, by a reviewing commander, by training personnel, by APD internal affairs, and by the APD Force Review Board. Officer Rose reported the use of force on Chacon shortly after securing Chacon, and Sergeant Smith's appearance at the scene resulted in a standard investigation, much of which is captured on Smith's dashboard camera.

Sergeant Smith summarized his investigation in a report, including various documentary evidence (dashboard camera videos, 9-1-1 calls, Taser logs, etc.), and forwarded the report up the chain of command. An APD Lieutenant and APD Commander reviewed the report. No level of review concluded Officer Rose or Officer Copeland violated any City policy on the use of excessive force, or acted unreasonably under the circumstances. The Force Review Board also reviewed the incident, and did not refer the case to Internal Affairs or require additional training be provided to

-6-

the Officer Defendants. The Officer Defendants were, however, debriefed by multiple supervisors and counseled on ways to improve their conduct in the future, such as using less profanity, identifying themselves as law enforcement officers, targeting different body parts when striking suspects, and creating distance before deploying a Taser.

**B.     Hiring**

The APD hiring process includes a detailed application, a comprehensive background check, a cognitive exam, an oral interview, a polygraph test, a psychological examination, a physical examination, and a physical fitness test. The psychological testing is designed in part to evaluate potential candidates in light of the fact they may be called upon to use force in performing their duties. Officer Rose's testing revealed some concerns he may be too passive in stressful situations, but the evaluator noted normal APD training would address this concern, and concluded Officer Rose was fit to be an APD officer. Officer Copeland's testing revealed some personality traits which might cause him difficulty on the job, but nevertheless concluded Officer Copeland would be a good police officer if hired. Both officers passed every stage of the application process.

**C.     Training**

All APD cadets are required to complete an eight-month training course prior to becoming officers. This course includes training on the use of force, and exceeds the amount of training required by the state licensing body. The training includes topics like frisking suspects for weapons upon arriving at a scene, and announcing oneself as a law enforcement officer. Both Officer Rose and Officer Copeland successfully completed the eight-month training program, and have received continuing education as required by the licensing body since becoming officers.

**D.     Discipline**

APD promulgates a set of general orders all officers must follow, and has policies in place to provide due process and discipline for officers accused of wrongdoing. These procedures include the multilevel reviews of uses of force, as well as internal investigations into potential violations of APD policy by officers. Discipline ranges from oral reprimand to termination, with excessive use of force justifying termination. APD also uses a Citizens' Review Panel and Office of the Police Monitor to receive and review citizen complaints and make disciplinary policy recommendations. Both Officer Rose and Officer Copeland were investigated following the incident with Chacon. Neither officer was disciplined or reprimanded because APD concluded no policy violation occurred. Neither officer had ever been disciplined for any infraction prior to this incident.

## Analysis

In separate motions, both the City and the Officer Defendants now move for summary judgment on all claims.

## I.   Motion for Summary Judgment—Legal Standard

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court

"may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

## II.     The City of Austin

Chacon asserts the City inadequately supervised and trained its officers in the reasonable use of force, and negligently hired and retained Officer Copeland and Officer Rose. The Court concludes the City is entitled to summary judgment on all claims.

### A.     Municipal Liability under § 1983

A municipality may not be held liable under § 1983 if the plaintiff was not deprived of any constitutional right. *Mace v. City of Palestine*, 333 F.3d 621, 625 (5th Cir. 2003) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). Nor may a plaintiff rely on the supervisory liability theory of *respondeat superior* to establish municipal liability under § 1983. *Johnson v. Deep East Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 308–09 (5th Cir. 2004) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978)). The thrust of the municipal liability doctrine is to eliminate the prospect of liability based on "isolated unconstitutional actions by municipal employees." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

"To establish municipal liability under § 1983, a plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 847 (5th Cir. 2009). Official policy may be found in "written policy statements, ordinances, or regulations, but it may also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Id.* (internal quotations omitted). The "moving force" standard is a higher burden than but-for causation, and requires a plaintiff to show "direct causation," in other words, "a direct causal link between the policy and the violation." *Id.* at 848 (internal quotation marks omitted). Stated differently, a municipality's decision must reflect "deliberate

-10-

indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision," which requires more than a showing of negligence. *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010) (internal quotation marks and citations omitted).

**B.     Chacon's Claims**

**1.     Inadequate Training or Supervision**

Chacon argues the City inadequately trained and supervised its officers, specifically Officer Rose and Officer Copeland, as evidenced by their behavior at the Studio 6 motel. He contends the consistent, improper behavior by both officers—failing to identify themselves as officers, failing to frisk Green upon arriving at the scene, and immediately drawing their guns on Chacon—illustrate a systemic failure in APD's training program. Chacon further argues his injuries were directly caused by the City's failure to properly train its officers, because properly trained officers would have handled the situation differently and avoided any need for a physical confrontation with Chacon.

The City is entitled to summary judgment on this claim for several reasons. First, Chacon has failed to produce evidence the training programs used by APD are inadequate. Where training complies with state law requirements, the Fifth Circuit has held a plaintiff must show "this legal minimum of training was inadequate to enable the [officers] to deal with 'usual and recurring situations' faced by jailers and peace officers." *Benavides v. Cnty. of Wilson*, 955 F.2d 968, 973 (5th Cir. 1992); *see also Sanders-Burns v. City of Plano*, 594 F.3d 366, 382 (5th Cir. 2010) (no evidence of inadequate training where officers completed state-mandated training program and plaintiff did not allege the state requirements were inadequate). The only evidence Chacon offers to prove APD's training programs, which actually require more training in use of force than state law demands, are inadequate is the behavior of the Officer Defendants in this case. APD has provided undisputed

-11-

historical evidence indicating force is employed by APD officers in under two percent of all arrests. City's Mot. Summ. J. [#39-1], Ex. A (Robinson Aff.) ¶ 23. While these particular officers may have reacted inappropriately in this case, their actions on this sole occasion do not prove APD's significant training efforts are inadequate.[4]

Second, Chacon has produced no evidence of deliberate indifference. As the Fifth Circuit has noted, "a showing of deliberate indifference is difficult, although not impossible, to base on a single incident." *Sanders-Burns*, 594 F.3d at 381. "Claims of inadequate training generally require that the plaintiff demonstrate a pattern [of similar violations]." *Id.* There is simply no evidence in this case of any similar incident involving either the Officer Defendants or any other APD officer. Nor did APD have any reason to suspect Officer Rose or Officer Copeland posed a risk of such behavior, as they both possessed unmarred disciplinary records prior to this incident. *See Sanders-Burns*, 594 F.3d at 382 (no deliberate indifference where plaintiff failed to produce evidence indicating "the need for more training was obvious and obviously likely to result in a constitutional violation" (internal quotation marks omitted)). Further, the City has provided evidence force is rarely used in APD arrests, which weighs heavily against the absence of any evidence suggesting a pattern or practice of contrary conduct.

Third, Chacon has failed to produce evidence indicating APD's training programs were the moving force behind Chacon's injuries in this case. There is no evidence the Officer Defendants engaged in their actions because some APD training regimen left them ill-equipped to handle the

---

[4] Chacon also cites to the "expert report" of George Kirkham in support of his inadequate training argument. This report, however, is merely a letter written to counsel by Kirkham. It is not sworn, and is not competent summary judgment evidence. Pl.'s Response to City [#42-7], Ex. 7. Kirkham further testified in his deposition, apparently conducted before discovery, he could not yet offer an opinion as to the adequacy of APD's training programs because he had not yet received any information other than the single incident involving Chacon. City's Mot. Summ. J. [#39-8], Ex. H (Kirkham Depo.), at 107:18–109:5.

situation. To the contrary, the evidence suggests the officers engaged in their behavior in spite of the rigorous training they had completed, including training on how to speak with suspects and when to use force against a suspect. *See Lewis v. Pugh*, 289 F. App'x 767, 775 (5th Cir. 2008) (unpublished) (independent actions of "rogue" officer, not made because of any city policy or custom, failed to satisfy "moving force" requirement).

## 2.    Negligent Hiring and Retention

Chacon also argues the City is liable for negligently hiring (and subsequently retaining) Officer Rose and Officer Copeland. Chacon bases each argument on a few sentences in each officer's hiring paperwork. With respect to Officer Rose, Chacon points to a note by Officer Rose's psychological evaluator which stated Officer Rose's tendency towards passivity or apathy in stressful situations could potentially be problematic. With respect to Officer Copeland, Chacon points to a discussion by Officer Copeland's evaluator of Officer Copeland's reported impatience.

None of the evidence identified by Chacon is sufficient to support his negligent hiring and retention claims. Here, as with Chacon's inadequate training claim, Chacon must prove the City acted with deliberate indifference in hiring the officers. As the United States Supreme Court has explained:

> Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute "deliberate indifference."

*Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 411 (1997). "There must be a strong connection between the background of the particular applicant and the specific violation alleged." *Gros v. City of Grand Prairie*, 209 F.3d 431, 434 (5th Cir. 2000) (citing *Brown*, 520 U.S.

at 412); *see also Brown*, 520 U.S. at 412 (culpability depends upon "a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff").

With respect to Officer Rose, it is certainly true the evaluator, Dr. Carol Logan, expressed her concern about Officer Rose's passive or apathetic demeanor in stressful situations. City's Mot. Summ. J. [#39-6], Ex. F (Logan Aff.), ¶¶ 5–7. Dr. Logan also concluded, however, Rose was emotionally, mentally, and psychologically fit to be an APD police officer, posed no higher than normal risk of using excessive force, made a good candidate for APD, and her concern could be remedied through standard APD training programs. *Id.*

Based on Dr. Logan's evaluation, no reasonable policymaker would conclude it was "plainly obvious" Officer Rose would go on to violate Chacon's constitutional rights by using excessive force. *Brown*, 520 U.S. at 411–12. In fact, Dr. Logan's evaluation provides absolutely no basis for concluding Officer Rose was at risk for using excessive force. Officer Rose had no history of violent behavior or criminal activity. A lone statement by Dr. Logan, especially read in light of her ultimately positive recommendation APD hire Officer Rose, fails to create a genuine dispute to send to a jury. *See id.*, 520 U.S. at 413–14 (standard not met where deputy had previously pleaded guilty to assault and battery and various alcohol-related offenses, and "may well [have] been an extremely poor candidate for reserve deputy"); *Gros*, 209 F.3d at 435–36 (*Brown* standard not met where officer "had never sexually assaulted, sexually harassed, falsely arrested, improperly searched or seized, or used excessive force against any third party"); *Butler v. Nance*, No. 4:01-CV-0093-A, 2002 WL 1042133, at *4–5 (N.D. Tex. May 21, 2002) (*Brown* standard not met where officer was known to lose his temper, lie about policy violations, and threaten suspects, among other things).

The same result obtains from an analysis of Officer Copeland's records. The background investigator expressed two specific concerns based on his review of Officer Copeland's application: first, he sometimes takes too long to make decisions; and second, he has been known to be impatient and get angry with those he believes have behaved wrongly. City's Sealed App. [#38-3], Ex. 3, at COA552. The investigator nevertheless concluded Officer Copeland "will be a good police officer should he be hired," and recommended he be hired. *Id.*

As with Officer Rose, these two minor flaws, buried amidst a mountain of positive information, are wholly insufficient to make it "plainly obvious" Officer Copeland would go on to use excessive force against Chacon. Officer Copeland had no prior criminal record and received universally positive recommendations. Even an individual known to be impatient or quick to anger poses no obvious threat of using excessive force. *See Brown*, 520 U.S. at 413–14; *Gros*, 209 F.3d at 435–36; *Butler*, 2002 WL 1042133, at *4–5.

Municipal liability is intentionally difficult to prove. The decision to depart from traditional *respondeat superior* principles and ideas of but-for causation and simple negligence was made so liability would be imposed on municipalities only where they are truly responsible for systematic violations of constitutional rights. Regardless of how unreasonable the Officer Defendants' individual actions may have been, Chacon has failed to present evidence sufficient to allow any reasonable juror to conclude the City of Austin is liable in this case. The City is therefore entitled to judgment as a matter of law on Chacon's municipal liability claims.

## III.   Officer Defendants

Chacon has also alleged an excessive use of force claim against Officer Rose and Officer Copeland. The Officer Defendants also move for summary judgment, raising the defense of qualified

immunity. While this defense is a formidable one, it is not absolute. Based on the Court's review of the summary judgment record, Chacon has "adduced sufficient evidence to raise a genuine [dispute] of material fact suggesting [the officers'] conduct violated an actual constitutional right, and . . . the officers' actions were objectively unreasonable in light of clearly established law at the time of the conduct in question." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012) (internal quotation marks omitted).

Before diving into the fact-intensive qualified immunity inquiry, the Court notes again its obligation to view the evidence in the light most favorable to Chacon. *Id.* at 629. "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007). Where, as in this case, there is a video recording of the events in question, the Court should analyze the video evidence and reject the plaintiff's account only where the video evidence so clearly discredits the plaintiff's story that no reasonable juror could believe the plaintiff's version of the events. *Id.* at 380.

## A.    Qualified Immunity Standard

"Qualified immunity protects public officials from suit unless their conduct violates a clearly established constitutional right." *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008) (internal quotation marks omitted). A plaintiff bears the burden of negating a properly raised qualified immunity defense. *Id.* The qualified immunity analysis itself involves two considerations: (1) whether the public official's conduct violated an actual constitutional right, and (2) whether the public official's actions were "objectively unreasonable in light of clearly established law at the time of the conduct in question." *Id.* (internal quotation marks and citations omitted). The standard "gives

ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks omitted).

It is clearly established the Fourth Amendment confers a right "to be free from excessive force during a seizure." *Poole*, 691 F.3d at 627. "To overcome the officers' claim of qualified immunity on his claim of excessive force, [Chacon] must show (1) an injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Id.* (internal quotation marks omitted). "Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

The United States Supreme Court has noted three particular sets of facts which deserve careful consideration: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *see also Deville*, 567 F.3d at 167. The Court must also "balance the amount of force used against the need for that force." *Ikerd v. Blair*, 101 F.3d 430, 434 (5th Cir. 1996). When analyzing an officer's actions at the scene, the Court must evaluate the use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and must ignore the underlying intent or motivation behind the officer's actions. *Poole*, 691 F.3d at 628 (internal quotation marks omitted).

**B.      Discussion**

The first question the Court must resolve is whether Chacon has produced sufficient evidence to create a genuine factual dispute concerning a violation of his Fourth Amendment right to be free

from the use of excessive force. It is undisputed Chacon suffered an injury. The relevant inquiries, therefore, are whether the injury resulted from the use of clearly excessive force, and whether the excessiveness was clearly unreasonable. As the Fifth Circuit has noted, "[t]hese inquiries are often intertwined." *Id.* To the extent possible, the Court must strive to analyze each officer's actions separately. *Id.*

The *Graham* factors create a suitable starting point for the Court's discussion. The first fact highlighted by *Graham* is "the severity of the crime at issue." 490 U.S. at 396. The crime at issue is not actually the crime Chacon was ultimately arrested for, which in this case was resisting a search. Instead, the relevant inquiry is what a reasonable officer on the scene would have believed the crime at issue to be. Importantly, even the Officer Defendants are unsure what crime Chacon allegedly committed at the motel. For example, Officer Rose affirms, based on the 9-1-1 call and his own conversation with Green, Chacon was "involved in a disturbance at the motel and was intoxicated." Officers' Mot. Summ. J. [#40-3], Ex. C (Rose Aff.) ¶ 23. This "disturbance" may also have involved a gun. *Id.* In other words, the officers had no reason to suspect Chacon of committing any specific crime—indeed, they did not suspect him of committing any particularized crime at all. At best, upon seeing Chacon drive up, and taking Green's version of the story at face value,[5] Chacon may have been driving while intoxicated.

---

[5] A reasonable officer would not have relied unquestioningly on Green's statements, as Officer Rose did. Officer Rose's dispatcher clearly told him at least two times during his approach to the scene the 9-1-1 caller reported an African American male with the precise description of Green had threatened the complainant with a gun. Pl.'s Resp. to Officers [#43-3], Ex. 3 (Rose Video), at 00:25–33; 1:28–1:32. The same reports can be heard in Officer Copeland's video. When Officer Rose arrived at the scene, he engaged Green in conversation, but took absolutely no measures to protect himself or to indicate he felt threatened by the report of a gun. Instead, Officer Rose exited his vehicle, left his gun holstered, and calmly spoke with Green about the report of a gun. It is undisputed Officer Rose never frisked or searched Green for a weapon. Instead, Officer Rose apparently accepted Green's version of the events and immediately assumed Chacon had a gun. Green's statement there was no gun resulted in inaction from Officer Rose, but Chacon's statement he had no gun—literally the first words Chacon spoke upon encountering Officer Rose—resulted in increased suspicion and the use of force.

The severity of the crime at issue counsels in favor of minimal, if any, force. Especially when viewed in the light most favorable to Chacon, the facts do not suggest Chacon was "suspected of a serious crime." *Deville*, 567 F.3d at 167. Accordingly, "the need for force [was] substantially lower" than the officers apparently believed. *See id.* (lower amount of force justified where plaintiff was stopped for speeding). The primary case relied upon by the officers, *Poole*, is highly distinguishable on this point. In *Poole*, the officers witnessed Poole driving his semi truck in a reckless manner; Poole threw some unknown liquid out the window of his vehicle and onto the (unmarked) police officer's car which was following him; and after being stopped, Poole smelled of alcohol, and confessed to drinking alcohol that morning. 691 F.3d at 628. The officers were eyewitnesses to dangerous and unlawful behavior, and were therefore justified in using a Taser to subdue Poole once they made the decision to arrest him on those charges and Poole resisted. *Id.* Here, the only indication the officers had of illegal activity by Chacon was the uncorroborated and obviously self-serving statement of the very person Chacon called the police to investigate, Green.

The second factor is whether Chacon posed an immediate threat to the officers or others. *Graham*, 490 U.S. at 396. This factor also counsels in favor of minimal, if any, force. Chacon, of course, was the party who actually called the police in the first place, and both officers' car radios can be clearly overheard stating, on at least two occasions, "complainant [Chacon] is in a silver BMW," the exact vehicle the officers saw approach the scene shortly after their arrival. Officer Rose now claims he felt Chacon's vehicle could have been used as a deadly weapon, and therefore posed a danger to him. Rose Aff. ¶ 24. The Court is mindful its obligation to view the situation reasonably, without the benefit of hindsight, cuts both ways. Rose's justification is an obvious post-hoc explanation for his behavior, and is completely discredited by his actions as captured by his own

dashboard camera. As Chacon approaches, Rose can be seen immediately drawing his weapon and rushing forward *towards Chacon* and his BMW. A reasonable officer who felt a drunk driver might attempt to use a vehicle as a deadly weapon would retreat to safety, perhaps behind his patrol car, to shield himself. Officer Rose did the opposite, rushing forward into the open parking lot and in the direction of the front end of the car he now claims posed a serious threat to him. The Court therefore disregards Officer Rose's explanation, and instead defers to the video evidence, which clearly contradicts his affidavit's claim. *See Poole*, 691 F.3d at 631.

Even after the officers approached Chacon with their guns drawn, there is no evidence indicating a reasonable officer would have felt threatened by Chacon's actions. As Chacon rounded the corner, Officer Rose commanded him three times to stop the car, and once to show his hands. Pl.'s Resp. to Officers [#43-3], Ex. 3 (Rose Video), at 3:40–43. Chacon stops the car and puts his hands out the window, calmly stating, "I don't have a gun." *Id.* at 3:43. The officers continue toward the car, and Chacon retracts his hands, which he claims was to put the car in park and turn off the ignition. *Id.* at 3:43–46. As Chacon explained in his deposition:

> Q:     You reached back into the car, though; didn't you, Mr. Chacon?
> A:     Yes, I did.
> Q:     Why were you — why did you do that?
> A:     This is a BMW. It requires you to push a button to put it in park. If you let go of the pedal, it keeps on going.
> Q:     Could, could you have just held the brake?
> A:     He told me to get out of the car.

Pl.'s Resp. to Officers [#43-4], Ex. 4 (Chacon Depo.), at 129:3–11. Officer Rose again orders Chacon to put his hands out the window a fourth time, then orders him to exit the vehicle. Rose Video at 3:46–50. It is undisputed Chacon then opened the door and got out of the car voluntarily. Chacon Depo. at 130:15–22. Officer Rose also affirms he looked into Chacon's car at this point and

did not see a gun. Rose Aff. ¶ 26. To this point, there is no evidence any reasonable officer would have felt threatened by Chacon.[6]

The video shows Chacon exit the vehicle, stating again he does not have a gun. Rose Video at 3:50–54. Chacon stands and turns around to face the vehicle, placing his back to the officers, while Officer Rose commands Chacon to "get on the ground, get on the fucking ground now." *Id.* Both officers took positions behind Chacon. Officer Rose twice orders Chacon, "don't move, don't move," which obviously makes complying with the previous order to get on the ground challenging. Officer Rose admits Chacon momentarily cooperates (Chacon states, "I'm not moving") by allowing the officers to take at least one of his arms while Officer Rose reached for his handcuffs. Rose Aff. ¶ 28. Chacon then asks Officer Rose if he is a police officer, turning his head to see the officers and possibly pulling his arm away. Rose Video at 4:00–:08. Officer Rose responds, "You're damn right I am," to which Chacon replies with something unintelligible on the video, which in turn provokes Officer Rose into shouting, "Don't fucking reach for anything," while punching Chacon in the side. *Id.* As the video makes clear, the officers, and particularly Officer Rose, are far more agitated than Chacon, who appears totally calm despite two officers attempting to handcuff him with no explanation and for no apparent reason.

A true struggle then breaks out, as Chacon spins around and shoves one of the officers off of him, which causes the officer to drop his flashlight. *Id.* at 4:08–:17. Both officers immediately force Chacon to the ground on his back. Officer Copeland promptly punches Chacon twice in the

---

[6] The officers' actions as captured on the video belie any notion they personally felt threatened by Chacon. Both officers drew their guns and marched into the open, completely exposed, as if reenacting a television cop drama. On television, action-hero police officers may well fling themselves into life-threatening situations with reckless abandon. In reality, two officers who felt their lives were in danger would take measures to protect themselves. Officer Rose and Officer Copeland did the opposite.

face. *Id.* at 4:17–:18. One of the officers tells Chacon to "stop moving," while the other tells him to turn over. *Id.* at 4:18–:21. The officers continue to struggle to get control of Chacon's arms, but manage to place a handcuff around his right wrist, all while Chacon repeatedly claims he is "just chewing his gum." *Id.* at 4:21–:40. Officer Rose admits Chacon then allowed the officers to lift him to turn him over onto his stomach. Rose Aff. ¶ 34. Chacon then appears to resist being pushed down onto his stomach, explaining there is an "operation" being run at the motel, presumably referencing the events described in his 9-1-1 calls. Rose Video at 4:40–:54. One of the officers again instructs Chacon to get on the ground. Officer Rose then draws his Taser and fires it at Chacon's back. The unmistakable clicking sound of the Taser can be heard while the officers wrestle Chacon to the ground and turn him over, with Chacon eventually surrendering, exclaiming "I'm done, I'm done, I'm done." *Id.* at 4:54–5:08.

Throughout this struggle, the threat posed to the officers, or to anyone else, by Chacon was minimal. Chacon's behavior demonstrated an immediate willingness to cooperate, as he slowed his vehicle and put his hands out the window, retracting them only once it was clear the officers wanted him to exit his vehicle. The fact the officers interpreted Chacon's actions in cooperating with their orders as threatening speaks to their unreasonableness, not Chacon's. Apparently the officers would have felt safer if Chacon had leapt from his running vehicle and allowed the car to coast into the nearby bystanders, another car, or the motel itself.[7]

It is also undisputed Chacon never swung, kicked, or attacked the officers in any way. *See* Kirkham Depo. at 78:10–:24 ("There certainly is no forcible resistance — no assaultive conduct at

---

[7] Alternatively, perhaps Chacon should have kept one foot on the brake while using some other body part to shift the car into park and turn off the ignition, all while keeping his hands out the window.

all."). This fact distinguishes this case from cases in which the suspects fought the police and thus represented a true danger to them. For example, in *Poole*, the majority contended an objectively reasonable officer could have found Poole to be a threat because he raised his hands at one of the officers and invited him to punch him, had been driving recklessly, and had admitted to drinking alcohol. *Poole*, 691 F.3d at 627–29. Unlike the suspect in *Poole*, Chacon never attempted to strike the officers or suggested they strike him. There is no evidence or even any suggestion Chacon was driving dangerously. Nor do the officers report smelling alcohol upon encountering Chacon; their only indication he had been drinking came from the uncorroborated statement of Green given upon the officers' arrival.

The officers' frequent retreat to the alleged presence of a gun is also unpersuasive, as Officer Rose admitted he did not see a gun in Chacon's car, Chacon immediately and repeatedly stated he did not have a gun, the officers had previously been told it was *Green* who had the gun, not Chacon,[8] and Chacon never took any offensive steps which might have suggested he was attempting to return to his car and grab a gun. Under these circumstances, an objectively reasonable officer would not have concluded Chacon, who remained remarkably calm until the Taser drive stuns were administered, posed a threat to anyone.[9] As the Fifth Circuit explained in a similar case:

> The officers' theory that they were trying to prevent serious injury or death to themselves is severely overwrought. The videos do not show Newman [the suspect] attempting to strike either officer, holding a weapon, or even reaching for his waistband. The officers did not try to warn each other or the other officers that Newman had a weapon, which might be expected if either officer truly thought that at the time.

---

[8] The officers apparently felt they faced no threat at all from Green, as they never even asked Green if he had a gun.

[9] To the contrary, an objective observer might reach the reasonable conclusion it was the officers themselves who posed the greatest danger to everyone present at the scene.

*Newman v. Guedry*, 703 F.3d 757, 762 (5th Cir. 2012). The Fifth Circuit concluded in *Newman* the officers' use of a Taser and nightstick were objectively unreasonable because there was no basis for concluding Newman posed any real or significant threat to the officers, even if he was not fully compliant. *Id.* at 763. The same is true here.

The third factor the Court considers is whether Chacon "actively" resisted arrest or attempted to flee. *Graham*, 490 U.S. at 396. There is no evidence Chacon ever attempted to flee. To the contrary, it is undisputed he voluntarily exited his car at the instructions of the two armed officers pointing their guns at him. The case law also draws a distinction between "active" and "passive" resistance. Simply refusing to comply with the orders of a law enforcement officer is passive resistance. *See Deville*, 567 F.3d at 167; *see also Poole*, 691 F.3d at 640–41 (Elrod, J., dissenting in part) (interpreting Poole's refusal to immediately comply as passive resistance, citing *Deville* and decisions by other circuit courts). Even if Chacon eventually crossed the line into the realm of active resistance—for example, when he shoved the officers off his back, or refused to be pushed down onto his stomach—the officers are not automatically entitled to punch him in the face and deploy their Tasers. *See Deville*, 567 F.3d at 167–68 (noting officers "must assess not only the need for force, but also the relationship between the need and the amount of force used" (internal quotation marks omitted)).

*Deville* itself provides a useful illustration. In *Deville*, the Fifth Circuit concluded summary judgment on qualified immunity was not warranted where an officer broke a suspect's driver's side window and pulled her out of the car during a traffic stop. 567 F.3d at 167–68. In particular, the Fifth Circuit noted: "A reasonable jury could infer from Deville's deposition testimony that Marcantel

-24-

engaged in very little, if any, negotiation with her—and find that he instead quickly resorted to breaking her driver's side window and dragging her out of the vehicle." *Id.* at 168. The same could happen here: Chacon has testified his resistance was primarily intended to prevent himself from being hurt by being thrown to the ground without his hands to brace his fall. The video makes clear the officers engaged in absolutely no negotiation with Chacon. They did not announce themselves as police officers. They did not ask to search his car or his person. They did not inform him he was being arrested. Instead, they immediately drew their guns and attempted to forcibly restrain Chacon. A jury could reasonably conclude, based on the record in this case, the officers acted unreasonably in applying clearly excessive force to secure the very individual they were called to assist.

Chacon has adduced sufficient evidence to create a factual dispute as to whether each officer violated his constitutional rights. Both officers' involvement in the entire struggle could likely have been avoided had the officers behaved reasonably. A jury could find Officer Copeland's two punches to Chacon's face were clearly excessive. At the time Officer Copeland struck Chacon, the officers had forced him onto the ground on his back. The video shows Chacon, with both officers on top of him, was, at most, holding his arms into his chest. Officer Copeland was later instructed by his supervisor, Sergeant Smith, to strike locations other than the face in the future because strikes to the face are generally not effective, which draws into question the reasonableness of Officer Copeland's explanation Chacon's head was the only available location to which he could deliver an effective strike. Officer's Mot. Summ. J. [#40-4], Ex. D (Copeland Aff.) ¶ 27.

A jury could also find Officer Rose's use of the Taser was excessive. When the Taser was deployed, Chacon was on his knees, and at most resisting the officers' efforts to push him down onto his stomach. He was not flailing or striking at the officers, nor was he attempting to stand and break

free. *See Ramirez v. Martinez*, No. 11-41109, slip op. at 12–13 (5th Cir. May 15, 2013) (denying qualified immunity where officer used Taser on non-threatening suspect, even where suspect had pulled away from officer's attempt to handcuff him). Officer Rose nevertheless deployed the Taser, and fired two additional drive stuns. Sergeant Smith later advised Officer Rose deploying a Taser in a close physical altercation is unwise, advice which calls into question the reasonableness of using a Taser under the circumstances. For example, a jury might conclude a reasonable officer would specifically avoid using a Taser under these circumstances, precisely to avoid what happened: both officers coming into contact with the Taser wires and shocking themselves.

This Court is well aware the Fifth Circuit conceives of arrests not as a "parlor game in which the arresting officers must consider the arrestee's sensibilities." *Poole*, 691 F.3d at 631 n.6. It is also unquestionable officers have a right to employ some level of force in order to effectuate an arrest. The question is whether an objective, reasonable officer would view the force used by the officers in this case as reasonable. "Although virtually all arrestees pose some level of threat to officers," based on the summary judgment record, Chacon posed a minimal threat to Officer Rose and Officer Copeland, and their decisions to punch Chacon in the face and shock him with a Taser would strike any objective officer as unreasonable in these circumstances. *See Poole*, 691 F.3d at 639 (Elrod, J., dissenting in part).

The Court's conclusion is bolstered by the circumstances created by the officers' own conduct. It was, after all, *the officers* who escalated the situation by drawing their weapons and shouting profanity at Chacon while they rushed his vehicle. Chacon was understandably bewildered by the unexplainable and bizarre behavior of the two police officers he believed were responding to his call for help. Yet Chacon remained remarkably calm well into the arrest process, despite what

-26-

reasonably appeared to Chacon to be a wholly baseless arrest of a man who never exhibited any aggressive or threatening behavior and was not even given an opportunity to explain himself to the officers before he felt the cold steel of handcuffs on his wrists. The Fifth Circuit has recognized the amount of force justified varies by the context of each situation. *Ikerd*, 101 F.3d at 434. In fact, "the use of *nearly any amount of force* may result in a constitutional violation when a suspect 'poses no threat to [the officers'] safety or that of others, and [the suspect] does not otherwise initiate action which would indicate to a reasonably prudent police officer that the use of force is justified.'" *Id.* (emphasis added) (quoting *Ware v. Reed*, 709 F.2d 345, 351 (5th Cir. 1983)). Under this standard, reasonable jurors might conclude the initial arrest—complete with an attempt to restrain Chacon's arms behind his back, and a swift left hook to Chacon's mid-section—constituted an excessive use of force well before the officers took Chacon to the pavement.

Having concluded Chacon has produced sufficient evidence to create a dispute about a constitutional violation, the Court must now consider whether Officer Rose and Officer Copeland's actions were unreasonable in light of clearly established law at the time of the event. *Id.* at 627. The "central concept" of this second prong of the qualified immunity analysis is "fair warning," whether a reasonable official would understand the conduct in this case violated the Fourth Amendment. *Newman*, 703 F.3d at 763. There need not be binding case law directly on point; even the *Graham* factors themselves—a case specifically covered by APD's training program[10]—can place an officer on notice. *Id.* at 764 (citing *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)).

Here, none of the *Graham* factors justified the level of force employed by the officers, and their behavior is therefore unreasonable in light of clearly established law. *See Newman*, 703 F.3d

---

[10] Robinson Aff. ¶ 11.

at 764. The unlawfulness of Officer Rose and Officer Copeland's behavior "would be apparent to a reasonable officer." *Manis v. Lawson*, 585 F.3d at 846 (5th Cir. 2009) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). A reasonable officer would have listened to both radio dispatcher descriptions of the 9-1-1 calls and been aware the calls were made by a man driving a silver BMW, and included a report of a gun in the possession of an African American male in a white shirt and black shorts. Upon arriving at the scene and encountering Green, a reasonable officer would have connected the dots and taken some action to ensure his safety in Green's presence. Upon recognizing the silver BMW, a reasonable officer would have engaged Chacon as Officer Rose engaged Green in this case: by asking what the problem was, not by immediately escalating the situation by drawing a gun and initiating physical contact with Chacon without so much as a word of explanation. *See Ikerd*, 101 F.3d at 435 (denying qualified immunity to officer who grabbed a ten-year-old girl by the arm and jerked her out of her chair and into another room). Officers are entitled to some "mistaken judgments" without losing qualified immunity. *Brumfield*, 551 F.3d at 326. They are not entitled to behave unreasonably simply because they are wearing uniforms.

## Conclusion

The Court concludes the City is entitled to judgment as a matter of law, but Chacon has produced sufficient evidence to survive the Officer Defendants' motion for summary judgment on qualified immunity. Overcoming qualified immunity is difficult, as the burden is intentionally high, but the summary judgment record supports the Court's conclusion here. The officers captured on the videos in this case are brash and aggressive, and their behavior endangered their own lives as well as Chacon's. As Chacon's luck would have it, the worst decision he made that night was to call 9-1-1 and request police assistance. Whether the officers are ultimately liable will be based on factual

determinations by a jury in our constitutional system, but Chacon has shown they are not entitled to summary judgment.

Accordingly,

IT IS ORDERED that Defendant The City of Austin, Texas's Motion for Summary Judgment [#39] is GRANTED;

IT IS FINALLY ORDERED that Defendants Officer Eric Copeland and Officer Russell Rose's Motion for Summary Judgment [#40] is DENIED.

SIGNED this the 21ᵖᵗ day of May 2013.

_Sam Sparks_

SAM SPARKS
UNITED STATES DISTRICT JUDGE