IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
2015 APR 30  PM 4: 39
CLERK U. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____

CARLOS CHACON,
             **Plaintiff,**

-vs-                                    **Case No. A-12-CA-226-SS**

OFFICER ERIC COPELAND and OFFICER
RUSSELL ROSE,
             **Defendants.**

_____

**O R D E R**

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Defendants Eric Copeland and Russell Rose's Motion for Judgment as a Matter of Law [#70],[1] Plaintiff Carlos Chacon's Motion for Entry of Judgment [#84], Defendant Russell Rose's Response [#86] thereto, and Plaintiff's Reply [#87] thereto, Defendant Russell Rose's Renewed Motion for Judgment as a Matter of Law, or, Alternatively Motion for New Trial or Remittitur [#85], Plaintiff's Response [#88] thereto, and Defendant's Reply [#89] thereto.  Having reviewed the documents, the governing law, and the file as a whole, the Court now enters the following opinion and orders.

**Background**

The following facts, recounted in a light most favorable to Plaintiff Carlos Chacon, are drawn in part from previous opinions of this Court and the Fifth Circuit.[2]  On the evening of April 29, 2011,

_____

[1] Defendants' Motion for Judgment as a Matter of Law [#70] was urged at the close of Plaintiff's evidence. The motion is DENIED.  Copeland is, however, entitled to a take-nothing judgment based on the jury's verdict.

[2] *See* Order of May 21, 2013 [#46]; *Chacon v. Copeland*, 577 F. App'x 355 (5th Cir. 2014) (unpublished).

Officers Eric Copeland and Russell Rose of the Austin Police Department arrested Chacon outside a north Austin Studio 6 motel. Earlier that evening, Chacon finished a late workout at the gym, then came home and began searching the Internet for a massage service open late. Finding one, he called the telephone number and scheduled an appointment for that night. The woman who answered the call told Chacon she was a masseuse, said a massage would cost $79, and directed Chacon to her location behind a restaurant.

Upon arriving at that location, Chacon saw no sign of a massage business or shopping center. Chacon called the woman again and was told to go to a specific room at the nearby Studio 6 motel. Though suspicious, Chacon testified he gave the woman "the benefit of the doubt" and went to the motel room, where he paid the woman $79. The woman, however, made it clear she provided sexual services, not massage. Chacon told the woman he would have to call the police to report her, and she asked him please not to do so; during their discussion, a man began kicking the door of the motel room and yelling at Chacon that the police were there and would tow his car unless he moved it.

Chacon left the room, found two persons who appeared to be a motel employee and an on-site security guard, and told them he believed a prostitution ring was being run out of the motel. When the employee and guard seemed reluctant to help him, Chacon placed the first of two calls he made to 9-1-1 that evening. Chacon testified around that time, the man who kicked the hotel room door and yelled at him reappeared and threatened to kill him, reaching into the waistband of his shorts as though he had a gun. Chacon then ran to his car, got inside, began driving, and initiated a second call to 9-1-1. Both 9-1-1 calls were recorded and played during trial. In each call, Chacon provided his general location at the motel and explained he had gone there to get a massage, but encountered some kind of "operation" being run, involving a "fake" security officer, one or two men,

and the alleged masseuse.  Chacon also claimed a man was walking around with a gun, waving it at him and trying to shoot him as he drove.

During both calls, Chacon's descriptions of the individuals involved were consistent. He noted the presence of an African-American male—the man he stated was walking around with a gun—who was wearing a black hat, black shorts, and a white shirt.  This man was later identified as John Green, a pimp known to the Austin Police Department.  Chacon also claimed a Hispanic male in an orange shirt and a woman in a blue security uniform, which he believed to be fake, were somehow involved.  Finally, Chacon informed the operator he was driving a silver BMW.

Officers Rose and Copeland were dispatched, and because Chacon reported the presence of a gun, the call was designated as a high-priority "hot shot" call.  Both officers drove to the scene in marked patrol cars with lights and sirens running, which activated their dashboard cameras and microphones.  The videos from both officers' cars were played several times during trial, and confirmed the officers' radio dispatcher stated, on at least two occasions, that the report was of an African-American male in black shorts and a white shirt carrying a gun, while the complainant (Chacon) was driving a silver BMW.

Officer Rose arrived first and encountered a group of four people: an African-American male in black shorts and a white shirt (Green), a woman in a security uniform, a Hispanic male in an orange shirt, and a white woman.  Rose was flagged down by Green and the woman in the security uniform.  Rose asked if anyone had called 9-1-1, and Green stated he had; when Rose asked Green whether he called about a gun, however, Green responded, "Ain't nobody called about no gun." Instead, Green told Rose he called 9-1-1 because a drunk man had come to his room and refused to leave, and was now circling the hotel parking lot in his BMW.  One of the women added she saw

the driver on the phone, and suggested perhaps he was the one who called about the gun.  No evidence at trial showed any calls to 9-1-1 were placed other than the two placed by Chacon.

In the midst of Rose's conversation with the group, Chacon's BMW came into view, and Green identified the car as containing the drunk man.  As Chacon slowly approached, Officer Rose immediately drew his gun, pointed it at Chacon, and charged toward the car without identifying himself as a police officer or any other type of law enforcement official.  Officer Copeland, who had arrived on the scene just as Rose began to approach Chacon's BMW, drew his gun as well and joined Officer Rose, acting with far less information than Rose had and relying on Rose's assessment of the situation in taking action.

As Officer Rose stormed toward the car with his gun trained on Chacon and Officer Copeland followed behind Rose with his weapon drawn,  Rose instructed Chacon, using statements laden with profanity, to stop the car and show his hands.  Chacon brought the car to a stop and initially reached his hands out the window; he then told Rose he did not have a gun and indicated Green was the one with the gun.  Chacon then withdrew his hands, allegedly to put the car in park. After Chacon withdrew his hands, Rose began yelling at Chacon to get out of the car.

As Chacon opened the car door to exit the vehicle, the officers grabbed Chacon, and Officer Rose began yelling at Chacon to get on the ground.  Chacon once again calmly explained he did not have a gun.  Once Chacon was out of the car and standing up, Officer Rose ordered him to get on the ground again.  This command was followed immediately by a new order to "not move."  Chacon replied, "I'm not moving" and asked Rose if he was a police officer, to which Rose replied, "You're damn right I am."

Officer Rose then attempted to handcuff Chacon. A scuffle broke out between the three men, with both officers struggling to take Chacon to the ground. It was undisputed that Chacon never tried to punch, kick, or otherwise attack either Rose or Copeland; Chacon testified he was attempting to lower himself to the ground while avoiding "hitting the ground the way [the officers] wanted me to," presumably so he would not be injured. Once Chacon was down on the ground, Officer Copeland punched Chacon in the face twice.

After securing a handcuff around one of Chacon's wrists, the officers attempted to turn Chacon onto his stomach. Unable to get the second cuff on Chacon, Officer Rose fired his Taser at Chacon three times—once in "dart" mode, and twice in "stun drive" mode. Following the Taser shocks, the officers were able to handcuff Chacon and keep him on the ground until backup arrived, at which point Chacon was arrested for resisting a search. EMS arrived to treat Chacon for a cut above his eye caused by Officer Copeland's punches. Chacon was taken to the hospital, received stitches to close the wound and treatment for various contusions and scrapes, and was discharged.

Chacon brought suit under 42 U.S.C. § 1983, alleging the officers used excessive force during the arrest in violation of his Fourth Amendment rights. A jury trial was held from March 3, 2015, to March 4, 2015. Following deliberation, the jury returned a verdict finding both officers used excessive force. The jury also considered whether the officers were entitled to qualified immunity for their actions, and found while Officer Copeland was entitled to qualified immunity, Officer Rose was not. Having found Officer Rose both liable and nonimmune, the jury awarded a total of $1,000,000 in damages to Chacon: $300,000 for past physical pain and mental anguish; $200,000 for future physical pain and mental anguish; $300,000 for past loss of capacity for enjoyment of life; and $200,000 for future loss of capacity for enjoyment of life.

Following the verdict, Chacon moved for entry of judgment, and Rose timely cross-moved for judgment as a matter of law, or alternatively, for remittitur or a new trial. As set forth below, the Court finds Rose is not entitled to judgment as a matter of law. However, the Court further finds the jury's award of $1,000,000 in damages was clearly excessive in light of the evidence presented. Accordingly, the Court reduces the damages award to a total of $60,000. Alternatively, if Chacon does not agree to the remittitur, the Court grants Rose's motion for a new trial on the issue of damages.

## Analysis

### I.    Renewed Rule 50(b) Motion

### A.    Legal Standard

When ruling on a Rule 50(b) motion for judgment as a matter of law, "[a] jury verdict must stand unless there is a lack of substantial evidence, in the light most favorable to the successful party, to support the verdict." *Am. Home Assurance Co. v. United Space Alliance, LLC*, 378 F.3d 482, 487 (5th Cir. 2004). Accordingly, the question for this Court "is whether the state of proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict." *Id.* (internal quotation marks omitted); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) ("Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.").

### B.    Application

Officer Rose contends he is entitled to judgment as a matter of law because no reasonable juror could have found he was *not* entitled to qualified immunity; stated differently, Rose argues

Chacon failed to show his injury resulted from clearly unreasonable excessive force.  The Court disagrees.

"Qualified immunity protects public officials from suit unless their conduct violates a clearly established constitutional right." *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008) (internal quotes omitted).  There is no dispute it is clearly established the Fourth Amendment confers a right to be free from excessive force during an arrest.  *See Deville v. Marcantel*, 567 F.3d 156, 169 (5th Cir. 2009) (per curiam) (explaining an arrestee has a clearly established right to be free from excessive force).  Excessive force claims are fact-intensive, requiring examination of "'[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" *Poole v. City of Shreveport*, 691 F.3d 624, 627–28 (5th Cir. 2012) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  The ultimate question "'is whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Id.* at 628 (quoting *Graham*, 490 U.S. at 397).

To overcome Rose's qualified immunity claim, Chacon was required to show (1) an injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.  *Id.*  The parties dispute only whether Rose's use of force was clearly excessive and clearly unreasonable.  "These inquiries are often intertwined." *Id.* (citing *Deville*, 567 F.3d at 167).

Viewed in the light most favorable to Chacon, the Court finds the evidence before the jury was such that reasonable and impartial minds could have found the force Officer Rose used in arresting Chacon was clearly excessive and clearly unreasonable.  Rose raises three arguments in

support of his contrary position: (1) Chacon posed a serious threat to Rose because the call for police assistance indicated a gun was potentially involved in the disturbance and Rose had reason to believe Chacon was intoxicated; (2) Chacon "physically and actively resisted . . . by pulling away his hands, shoving Rose, and struggling in an effort to refuse to be handcuffed and searched"; and (3) the jury impermissibly "punish[ed] Rose for not knowing whether Chacon called 9-1-1." Mot. Judgment as a Matter of Law [#70] at 3; Renewed Mot. [#85] at 4, 5. None of these arguments persuade the Court there is a lack of evidence sufficient to support the verdict in Chacon's favor, as all rely on a construction of the evidence in the light most favorable to Rose.

First, the Court finds there is ample evidence from which the jury could have found Chacon posed minimal threat or no threat at all to Officer Rose, despite the report of a gun, and despite Green's accusation Chacon was intoxicated. Crucially, Rose was twice informed by the radio dispatcher that a black male wearing black shorts and a white shirt was the person who allegedly had a gun, and that a person driving a silver BMW was the person who called 9-1-1. Yet, when Officer Rose encountered Green—a black male wearing black shorts and a white shirt—Rose credited Green's assertion that Chacon—a person driving a silver BMW—was the individual causing the problem. Moreover, Officer Rose ignored further indications Chacon was unarmed: Green never accused Chacon of having a gun, and in fact, *denied* having called 9-1-1 about a gun. Rose's dash camera and microphone recorded both instances in which the dispatcher's descriptions of Green and Chacon were played in Rose's patrol car, and that video and audio was played for the jury during trial; Rose's claim he did not hear the radio dispatcher relay the descriptions created a credibility question the jury could have resolved against Rose.

Further, a jury could have found Chacon's behavior as the encounter began was nonthreatening to Rose because Chacon fully complied with Rose's initial commands. The video from Rose's dashboard camera shows Chacon slowly approached in his BMW and immediately stopped the car when Rose directed him to do so; Chacon did not try to flee or speed toward Rose. When Rose instructed Chacon to put his hands out of the window, Chacon once again immediately complied. Notably, the first things Chacon said to Rose were "[Green]'s the one with the gun," and "I don't have a gun."

Finally, as for Rose's alleged belief Chacon was intoxicated, the jury could have found Rose's own testimony controverted that position, as during adverse direct examination, Rose testified he did not smell an odor of alcohol on Chacon that night. Based on all of the above, the jury could have concluded Chacon posed no threat to Officer Rose, despite the report of a gun and Green's assertion Chacon was intoxicated.

Second, Rose's argument the evidence was insufficient for the jury to find Chacon was not resisting lacks merit. Rose argues the alleged resistance began when Chacon withdrew his hands into the car, *see* Renewed Mot. [#85] at 5; however, Chacon testified he did so to put the car in park when it became clear the officers wanted him to get out of his vehicle. Further, Officer Rose's dash camera showed after Chacon withdrew his hands, the officers opened Chacon's car door, and Chacon calmly and voluntarily began to get out; the officers, however, grabbed Chacon and began dragging him from the vehicle. Rose claims Chacon demonstrated resistance by failing to comply with his commands, but the jury could have found Rose's commands were confusing and conflicting. Rose ordered Chacon to "get on the ground, get on the fucking ground now" as the officers reached for Chacon's arms—but Rose then contradicted his previous order by yelling "don't move, don't move."

Chacon testified he attempted to comply with the conflicting commands, and can be heard on the video stating "I'm not moving."

While the video does show Chacon spun around and shoved Officer Rose away from him, the video does not compel a finding in favor of Rose. As the Fifth Circuit noted, "[t]he seriousness of Chacon's shove, and whether a finder of fact could conclude that the shove was not active resistance, or was disproportionately minor in relation to the severity of force used by the officers, were fact questions not resolvable by the video and properly put to a trier of fact." *Chacon v. Copeland*, 577 F. App'x 355, 362 (5th Cir. 2014) (unpublished). Chacon never attempted to run away or attack either of the officers. Chacon testified that during the struggle, he was moving because he "was trying to prevent [him]self from hitting the ground the way [the officers] wanted [him] to" and that throughout the encounter, he was "trying to engage them in conversation" and "talking to [them] very, very calmly." Chacon Trial Tr. at 59:6–10, 59:25–60:2. If the jury credited Chacon's explanation of the struggle shown on the video, the jury could have further concluded Rose used unreasonable and excessive force when he tased Chacon three times. *See Williams v. City of Cleveland, Miss.*, 736 F.3d 684, 688 (5th Cir. 2013) ("We note that in previous Taser cases in which we have rejected qualified immunity for officers, the person tased was not attempting to flee."); *Massey v. Wharton*, 477 F. App'x 256, 263 (5th Cir. 2012) (unpublished) (finding summary judgment for officer on qualified immunity inappropriate where the arrestee the officer tased "was attempting to comply with the officers' commands, . . . was not a threat to the officers or others, and . . . was not attempting to flee"). Further, even if the jury concluded Chacon demonstrated some minimal resistance, the jury could have found Rose used a degree of force in subduing Chacon disproportionate to that resistance.

Finally, Officer Rose asserts that the jury "punish[ed] Rose for not knowing whether Chacon called 9-1-1, for listening to witnesses on the scene, and for approaching the car as he did" and claims "th[o]se matters were simply not at issue here." Renewed Mot. [#85] at 5. The Court disagrees. The question whether Officer Rose heard the radio dispatcher describe Chacon and Green is material to whether Rose's use of force in drawing his weapon and aggressively charging toward Chacon's vehicle with the gun pointed toward Chacon, dragging Chacon from his vehicle as Chacon attempted to explain he was unarmed, forcing Chacon to the ground, and tasing Chacon three times was reasonable and proportionate to the threat Chacon allegedly posed, since Rose would have had no reason to believe Chacon was armed and dangerous had he heard the radio dispatcher. Whether Rose heard the radio dispatcher is also material to whether Rose acted in a "plainly incompetent" manner that night, bringing his actions outside the ambit of qualified immunity. *See, e.g.*, *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law" (internal quotation omitted)).

Consequently, viewed in the light most favorable to Chacon, the Court is unable to conclude there was a lack of substantial evidence to support the jury's verdict. Accordingly, Officer Rose's motion for judgment as a matter of law must be denied.

## II.     Motion for New Trial or Remittitur

### A.     Legal Standard

Under Federal Rule of Civil Procedure 59(a), a district court may, in its discretion, grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a). Rule 59 motions have traditionally been granted where the movant shows the judgment is based upon a manifest error of fact or law or presents newly

discovered or previously unavailable evidence. *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990).

A court may order a remittitur where the jury's damages award "is entirely disproportionate to the injury sustained." *Caldarera v. E. Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir. 1983). An "entirely disproportionate" award is one "so large as to shock the judicial conscience, so gross or inordinately large as to be contrary to right reason, so exaggerated as to indicate bias, passion, prejudice, corruption, or other improper motive," or one which "clearly exceed[s] that amount that *any* reasonable man could feel the claimant is entitled to." *Id.* (footnotes and internal quotes omitted). A verdict is excessive as a matter of law if it exceeds "any rational appraisal or estimate of the damages that could be based upon the evidence before the jury." *Brunnemann v. Terra Int'l, Inc.*, 975 F.2d 175, 178 (5th Cir. 1992) (internal quotes omitted).

Where a damages award is excessive, the court "may either order a new trial on damages or may give the plaintiff the option of avoiding a new trial by agreeing to a remittitur of the excessive portion of the award." *Hernandez v. M/V Rajaan*, 841 F.2d 582, 587 (5th Cir. 1988) (citing *Osburn v. Anchor Labs., Inc.*, 825 F.2d 908, 919 (5th Cir. 1987)). The size of the remittitur is determined in accord with the "maximum recovery rule," under which the verdict must be reduced to the maximum amount the jury could properly have awarded. *See Naquin v. Elevating Boats, L.L.C.*, 744 F.3d 927, 940 n.67 (5th Cir. 2014) ("Under this circuit's 'maximum recovery rule,' we will uphold a jury award if there is a damage award in at least one 'factually similar case from the relevant jurisdiction' that, when increased by 50%, equals or exceeds the challenged jury award." (quoting *Moore v. M/V ANGELA*, 353 F.3d 376, 384 (5th Cir. 2003)). "'Of course, [the court's] reassessment of damages cannot be supported entirely by rational analysis, but involves an inherently subjective

-12-

component.'" *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 489 (5th Cir. 2001) (quoting *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, 183 (5th Cir. 1995)).

## B.    Application

As previously noted, the jury awarded a total of $1,000,000 in damages to Chacon: $300,000 for past physical pain and mental anguish; $200,000 for future physical pain and mental anguish; $300,000 for past loss of capacity for enjoyment of life; and $200,000 for future loss of capacity for enjoyment of life. The Court finds the awards for future physical pain and mental anguish and future loss of capacity for enjoyment of life must be remitted in full, as Chacon presented no evidence supporting a finding of future damages. The Court further finds the award for past physical pain and mental anguish should be reduced to $35,000, and the award for past loss of capacity for enjoyment of life should be reduced to $25,000. Accordingly, the Court remits $940,000 in damages, and awards Chacon a total of $60,000. Alternatively, if Chacon chooses not to accept the award as remitted, the Court grants Rose's motion for new trial on the issue of damages.[3]

### 1.    Future damages

Officer Rose argues both of the jury's future damages awards should be remitted in full because Chacon produced no evidence whatsoever to support them. The Court agrees. Chacon's physical injuries—a laceration above his eye, contusions, and several scrapes—were minor, and have not required ongoing treatment. As for mental distress and loss of capacity for enjoyment of life, Chacon testified despite the incident, he is "able to go on" with his life, and when asked whether the

---

[3] Rose contends a new trial must be awarded as a matter of law because "the jury was motivated by passion or prejudice." Def.'s Reply [#89] at 6. While Rose is correct a new trial is warranted where a damage award is motivated by passion or prejudice, *see, e.g., Consol. Cos., Inc. v. Lexington Ins. Co.*, 616 F.3d 422, 435 (5th Cir. 2010), the Court rejects Rose's claim the jury was necessarily so motivated here. It is just as likely the jury's excessive award included an impermissible valuation of the deprivation of Chacon's constitutional rights, or was a consequence of defense counsel's failure to provide its own damages valuation to the jury in the event of a loss on liability.

effects of the incident would be "with [him] forever," responded he "definitely think[s] that it's going to be okay because when you have a support system of people that love you and support you, you get through everything." Chacon Trial Tr. at 85:6–15. Further, nothing in Chacon's psychiatric records demonstrates a need for ongoing treatment in connection with the arrest. Consequently, the Court finds there is no basis in the record from which the jury could have estimated future damages, and therefore remits in full the jury's awards for future physical pain and mental anguish and future loss of capacity for enjoyment of life.

### 2.      Past physical pain and mental anguish

Officer Rose next contends there is no support in the record for an award of past physical pain and mental anguish. As set forth below, the Court cannot agree. The Court does find, however, the $300,000 awarded by the jury clearly exceeds "any rational appraisal or estimate of the damages that could be based upon the evidence," *Brunnemann*, 975 F.2d at 178, and consequently, remits the amount to $35,000.

First, Rose argues Chacon's physical injuries were minor and were mostly caused by Copeland's punches, not Rose's actions. Yet it was Officer Rose's decision to draw his weapon and charge at Chacon as Copeland arrived on the scene that led to the physical violence, and the jury found both officers used excessive force; that violation of Chacon's Fourth Amendment rights is a single harm for which the jury found Rose liable. The laceration over Chacon's eye was severe enough to require stitches and caused his eye to remain swollen for several weeks. The wound was serious enough to require examination by an ophthalmologist to ensure Chacon's retina was not damaged (it was not). Additionally, Chacon suffered physical injuries other than the laceration to

his eye; he was also treated for contusions and scrapes during his visit to the emergency room. *See* Pl.'s Tr. Ex. 13 at CHACON 0153, 0157–58.

More importantly, however, the verdict form instructed the jury to make a single award compensating for *both* past physical pain and past mental anguish, and as was made clear during trial, the overwhelming majority of Chacon's claimed past damages arose from his past mental anguish. Compensatory damages for mental anguish must "'be supported by competent evidence concerning the injury.'" *Brady v. Fort Bend Cnty.*, 145 F.3d 691, 718 (5th Cir. 1998) (quoting *Carey v. Piphus*, 435 U.S. 247, 264 n.20 (1978)). In *Brady*, the Fifth Circuit explained the quantum and nature of proof necessary to support mental anguish damages:

> First, we articulated the level of specificity needed to prove a claim for mental damages under *Carey*. We held that there must be a "specific discernable injury to the claimant's emotional state," proven with evidence regarding the "nature and extent" of the harm. We acknowledged that "hurt feelings, anger, and frustration are part of life," and were not the types of harm that could support a mental anguish award. . . .
>
> Second, we addressed the types of evidence that may be used to clear that hurdle. We observed that in proving mental damages "a claimant's testimony alone *may* not be sufficient to support anything more than a nominal damage award." We noted that *Carey* requires evidence that "*may* include corroborating testimony or medical or psychological evidence." . . . The existence, nature, and severity of emotional harm must be proved. Emotional harm *may* manifest itself, for example, as sleeplessness, anxiety, stress, depression, marital strain, humiliation, emotional distress, loss of self esteem, excessive fatigue, or a nervous breakdown.

*Id.* at 718. Further, the Fifth Circuit has found that in some circumstances,

> "a plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress based on a constitutional violation; however, the testimony must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated; neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a constitutional violation occurred supports an award of compensatory damages."

*Vadie v. Mississippi State University*, 218 F.3d 365, 377 (5th Cir. 2000) (quoting *Price v. City of Charlotte*, 93 F.3d 1241, 1254 (4th Cir. 1996)).

Broadly speaking, three pieces of evidence arguably support Chacon's mental anguish claim: Chacon's testimony, the testimony of his niece, Michel Chacon (Michel), and Chacon's psychiatric records. The heart of Chacon's testimony was as follows:

> Q.      You seem to have—you seem to exhibit today in the courtroom a great deal of agitation about all of this. Does this bother you?
>
> A.      This is very embarrassing. I'm actually going to jail because I call the police for help. That is not right. That is not what I remember from all the years I've lived here in Texas. It's also bad for my children. I don't want them to see that, ever.
>
> Q.      Do you still have these problems every [] time you think about this incident?
>
> A.      I get agitated. Yes, sir. I get very embarrassed and agitated.
>
> Q.      Have you tried to overcome this?
>
> A.      Yes, I have.
>
> Q.      I see you saw a psychiatrist, instead of a psychologist?
>
> A.      Yes, sir, I have.

Chacon Trial Tr. at 84:14–85:4. Chacon also testified although he had been treated for "mild anxiety" prior to the incident, he suffered from increased anxiety thereafter and was, as of the time of trial, taking 30 milligrams of Prozac per day. *Id.* at 72:6–17.

Michel, who lived with Chacon at the time of his arrest and testified she knows Chacon well, *see* Michel Trial Tr. at 3:4–8, 16–19, gave the following testimony concerning her uncle's state of mind after the arrest:

> Q.      Can you tell if [the arrest] has had any effect on [Chacon] from what you've observed?

-16-

A.      Yes. . . . Pretty much disappointing, I said, about the authorities and very upset. He's one of those people that really likes to do the right thing. So I think that's . . . part of it.

Q.      Can you tell whether he still has angst over the event?

A.      Yes, definitely.

[. . .]

Q.      Would you say it's sort of casual or is it something that really affects his happiness?

A.      I'd say it really affects his happiness.

*Id.* at 4:24–5:8, 6:6–8.

While Michel's testimony corroborates Chacon's, the evidentiary effect of Chacon's psychiatric records is less clear. Officer Rose urges—just as he did during trial—that the records refute Chacon's mental anguish claim, as Chacon's dosage of anti-anxiety medication was reduced for a four-week period of time following the arrest. The Court is unpersuaded by Rose's argument. First, as previously noted, Chacon is not required to adduce medical evidence corroborating his mental anguish claim, so long as other evidence in the record establishes he suffered demonstrable emotional distress. *See Vadie*, 218 F.3d at 377. Second, accepting Rose's argument would require this Court to engage in an impermissible re-weighing of the evidence. While the psychiatric records show Chacon's dosage of medication has fluctuated since the arrest, and was lowered for approximately four weeks thereafter, Chacon is indeed, as he testified, currently taking an increased dose of medication. *See* Defs.' Tr. Ex. 28 at COA 001642 (Jan. 1, 2010, 20mg/day); *id.* at COA 001639 (July 22, 2011, 20mg/day); Defs.' Tr. Ex. 24 at COA 001555 (Aug. 9, 2011, 10mg/day); *id.* at COA 001543 (Sept. 6, 2011, 20mg/day); *id.* at COA 001538 (Aug. 13, 2012, 30mg/day). While

the medical records may provide little or no support for the jury's damages award, it is the jury's province, not the Court's, to evaluate Chacon's credibility and weigh his testimony against what is shown by the psychiatric records. *See Reeves*, 530 U.S. at 150 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." (internal quotation and citation omitted)). The Court rejects Rose's argument to the contrary.

The Court concludes the testimony given by Chacon and Michel establishes Chacon suffered compensable mental anguish, which manifested as humiliation and anxiety, because of the incident. Additionally, as noted above, the evidence showed Chacon suffered some physical injuries, albeit minor ones. It is clear, however, that the evidence cannot support the jury's $300,000 damages award, particularly given the inconclusive nature of the psychiatric records and the absence of serious physical injuries. The Court therefore finds an award greater than $35,000 would be excessive, and remits the jury's award accordingly.

### 3.    Past loss of capacity for enjoyment of life

Before addressing the sufficiency of the evidence as to this element of damages, Officer Rose argues an award of damages for loss of capacity for enjoyment of life is necessarily duplicative of an award of damages for mental anguish. The Court disagrees. Loss of capacity for enjoyment of life is conceptually distinct from mental anguish. For example, a person might lose a foot in an accident, and experience pain and mental anguish; but once the body heals and the anguish fades, the harms the person suffers given the loss of the foot, such as difficulty ambulating, or inability to participate in certain recreational activities, still remain, and are compensable. *See Smith v. Harrah's New Orleans Mgmt. Co.*, 213 F. App'x 353, 361 (5th Cir. 2007) (unpublished) ("A plaintiff is

entitled to recover damages for loss of life enjoyment if he proves that his lifestyle was detrimentally altered or if he was forced to give up activities because of his injury.  Loss-of-life-enjoyment damages can be awarded separately from other general damages, such as mental and physical pain and suffering." (internal quotes and citations omitted) (applying Louisiana law)).   While the distinction is not as obvious where the injury suffered is primarily mental rather than physical, it still can be clearly drawn: a person subjected to an unreasonable search and seizure,[4] for example, might experience acute mental anguish following the incident, and once that acute mental anguish fades, lasting harms, such as post-traumatic stress or an altered outlook on life, could remain.  The Court therefore rejects Rose's argument the damages awarded for loss of enjoyment of life must be duplicative of those awarded for physical pain and mental anguish.  Moreover, even if there were some overlap between the two categories, the jury was specifically instructed not to award damages twice for the same loss, and the Court presumes the jury followed that instruction.  *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987) (discussing "[t]he rule that juries are presumed to follow their instructions").

Chacon presented evidence from which the jury could have found he suffered a compensable past loss of capacity for enjoyment of life.  Chacon testified that two years following the arrest, he moved to Houston because of the lasting impact it had on his ability to enjoy life here in Austin: "I moved to Houston over two years ago . . . [because] I found myself more stressed here [in Austin]. And with the situation that happened, I don't feel that I'm safe here."  Chacon Trial Tr. at 84:9–13. Michel's testimony corroborated Chacon's on this point, as she testified while her uncle had

---

[4] To draw an example from history: "The complaint alleges that 13 Chicago police officers broke into petitioners' home in the early morning, routed them from bed, made them stand naked in the living room, and ransacked every room, emptying drawers and ripping mattress covers." *Monroe v. Pape*, 365 U.S. 167, 169 (1961).

previously enjoyed living in Austin, he decided to move away because of his continuing upset following the arrest. Michel Trial Tr. at 5:10–19. Additionally, Chacon testified this incident jeopardized his eligibility for service on several governor-appointed Texas state boards—community service Chacon explained was very important to him and made him "very proud," particularly given his Hispanic heritage and roots in El Paso—because he now has an arrest record, and each of his appointments involved a background investigation to ensure the absence of a criminal record. Chacon Trial Tr. 79:16–81:2. Chacon's inability, given this incident, to continue his community service by serving on Texas state boards is a compensable harm.

While this testimony is sufficient to support a finding of past loss of capacity for enjoyment of life, it is a somewhat thin reed, and the Court finds it is clearly insufficient to support an award of $300,000. On the present record, the Court concludes an award greater than $25,000 would be excessive, and remits the jury's award accordingly.

## Conclusion

While the record supports the jury's findings regarding Officer Rose's liability and lack of entitlement to qualified immunity, the jury's damages award is clearly excessive in light of the evidence presented. On the present record, a total award of no more than $60,000 is warranted, and judgment will be entered in this case for that amount—unless, of course, Chacon opts for a new trial on the issue of damages. The Court advises Chacon he has fourteen days to consider whether doing so would ultimately produce a more fulsome record.

Accordingly:

IT IS ORDERED that Defendant Russell Rose's Renewed Motion for Judgment as a Matter of Law, or, Alternatively Motion for New Trial or Remittitur [#85] is GRANTED IN PART and DENIED IN PART as described in this opinion;

IT IS FURTHER ORDERED that the jury's award of damages is REMITTED to a total of SIXTY THOUSAND DOLLARS AND 00/100 ($60,000.00), comprised of an award of THIRTY-FIVE THOUSAND DOLLARS AND 00/100 ($35,000.00) for past physical pain and mental anguish and TWENTY-FIVE THOUSAND DOLLARS AND 00/100 ($25,000.00) for past loss of capacity for enjoyment of life;

IT IS FURTHER ORDERED that, within fourteen (14) days from date of entry of this order, Plaintiff Carlos Chacon must either file in the record of this case an acceptance of the remittitur or a notice of his intent to retry the issue of damages;

IT IS FURTHER ORDERED that Plaintiff Carlos Chacon's Motion for Entry of Judgment [#84] is HELD IN ABEYANCE pending his above-described choice;

IT IS FURTHER ORDERED that Defendants Eric Copeland and Russell Rose's Motion for Judgment as a Matter of Law [#70] is DENIED; and

IT IS FINALLY ORDERED that Defendant Eric Copeland is entitled to judgment in his favor based on the jury's verdict.

SIGNED this the 30ᵗʰ day of April 2015.

_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE